Filed 3/17/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| PETER PAUL REGINA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>STATE OF CALIFORNIA et al.,<br><br>    Defendants and Respondents. | B316404<br><br>(Los Angeles County<br>Super. Ct. No.<br>21STCV09546) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John P. Doyle, Judge.  Affirmed.

Daniels Law, William A. Daniels, Jr., William A. Daniels; Klass Helman & Ross and Robert R. Ross for Plaintiff and Appellant.

Rob Bonta, Attorney General, Thomas S. Patterson, Assistant Attorney General, P. Patty Li and Megan A.S. Richards, Deputy Attorneys General, for Defendants and Respondents.

_____

Before a federally licensed firearms dealer may sell or transfer a firearm in California, the dealer must submit certain purchaser information to the California Department of Justice for the Department to conduct a background check to determine whether the individual is prohibited by federal or state law from purchasing a firearm.[1]  If the background check reveals an arrest or criminal charge, the Department has 30 days from the date of submission to investigate whether that arrest or charge resulted in a disqualifying conviction.  Pursuant to Penal Code section 28220, subdivision (f)(4),[2] if the Department is unable within the 30-day period to ascertain the final disposition of the arrest or charge, the Department must notify the dealer of that fact in writing and inform the dealer it may immediately transfer the firearm to the purchaser.

Peter Paul Regina sued the State of California and Rob Bonta and Xavier Becerra in their capacities as the current and former Attorney General after a federally licensed firearms dealer refused to complete Regina's purchase of an antique shotgun.  Regina alleged the dealer had received a letter from the Department pursuant to section 28220, subdivision (f)(4), advising it that the Department had been unable within the statutory period to ascertain Regina's eligibility to purchase the firearm.  Although the Department's letter in accordance with

---

[1]     Penal Code section 28150, subdivision (a), defines "purchase" for purpose of the background-check requirement as "purchase, loan, or transfer of a firearm," and subdivision (b) defines "purchaser" as "the purchaser or transferee of a firearm or the person being loaned a firearm."

[2]     Statutory references are to this code unless otherwise stated.

2

section 28220, subdivision (f)(4), authorized the immediate transfer of the firearm to Regina at the dealer's discretion, the dealer elected not to do so, telling Regina it was unwilling to "take the risk."

In his operative second amended complaint Regina alleged a federal civil rights claim (42 U.S.C. § 1983) and requested declaratory relief, asserting in both causes of action that section 28220, subdivision (f)(4), was unconstitutional because it burdened, or at the very least chilled, a purchaser's exercise of Second Amendment rights. In addition, as part of his declaratory relief cause of action, Regina alleged the statute was in conflict with, and preempted by, the Brady Handgun Violence Prevention Act (Brady Act) (18 U.S.C. § 922).

The trial court sustained without leave to amend the demurrer of the State and the Attorneys General to the second amended complaint. On appeal from the judgment dismissing the action, Regina contends the trial court erred in concluding as a matter of law that section 28220, subdivision (f)(4), did not violate the Second Amendment on its face or as applied and was not preempted by the Brady Act. Alternatively, he insists we must at least reverse and remand for the parties to brief, and the trial court to consider in the first instance, his constitutional challenges to section 28220, subdivision (f)(4), in accordance with the United States Supreme Court's recent decision in *New York Rifle & Pistol Assn. v. Bruen* (2022) __ U.S. __ [142 S.Ct. 2111] (*Bruen*).

The Department's notice to a firearms dealer pursuant to section 28220, subdivision (f)(4), does not prevent a prospective purchaser from owning or possessing a firearm or restrict an individual's ability to acquire a firearm. Nor did it do so here.

3

The statutory scheme challenged by Regina lies beyond "the outer bounds of the right to keep and bear arms." (*Bruen*, *supra*, 142 S.Ct. at p. 2127.) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Regina's Attempt To Purchase a Firearm from a Federally Licensed Firearms Dealer*

As alleged in the operative second amended complaint, on August 8, 2019 Regina entered into a firearm transfer agreement with a federally licensed firearms dealer for the sale of a William Moore & Co. double barrel antique shotgun. Regina, a California resident, purchased the firearm in another state; and the firearm was shipped to a federally licensed firearms dealer in California to initiate Regina's background check as a precondition to transferring the firearm.[3]

On August 14, 2019 the the Department advised Regina in writing his background check had identified "state and/or federal records matching your identifying information" that "if confirmed would prohibit the purchase." The Department told Regina that, if the Department was unable to make an eligibility determination within the statutory 30-day time period, "the dealer will be notified and may deliver the firearm(s) to you at his/her discretion." Although the letter did not identify the potentially disqualifying information, according to Regina's pleading the FBI reported Regina's 1967 arrest for burglary, which would have made him ineligible to purchase the firearm only if it had resulted in a felony conviction.

---

[3] Federal law prohibits federally licensed firearms dealers from selling a firearm to a person who is not a resident of the state where the dealer is located. (18 U.S.C § 922(a)(3), (b)(3).)

On August 31, 2019, in response to Regina's request, the Department advised Regina in writing his fingerprints did not identify any criminal history record maintained by its Bureau of Criminal Information and Analysis. However, the Department continued, "[T]his response does not constitute a complete firearms eligibility clearance."

On September 5, 2019, in response to the Department's request for information, the Los Angeles County Superior Court provided the Department with court records that Regina alleged disclosed the charge had been "reduced to a misdemeanor pursuant to section 17" and dismissed. According to Regina, these court records confirmed he was not prohibited under state or federal law from obtaining a firearm.

Despite having the court records in its possession, the Department sent the dealer a letter on September 8, 2019 pursuant to section 28220, subdivision (f)(4), stating 30 days had elapsed and it had been unable to determine Regina's eligibility to own or possess firearms. Accordingly, "in compliance with Penal Code section 28220, subdivision (f)(4), you may release the firearm to the purchaser/transferee at your discretion." The dealer, however, refused to complete the sale, telling Regina it did not want to take the risk of transferring the weapon to him.

On December 10, 2020 Regina made a second attempt to purchase the firearm. According to Regina, "[e]ven though [the Department] had in its possession clear evidence that Plaintiff was qualified to obtain a firearm, it issued 'undetermined eligibility' letters on December 12, 2020 and after and so prevented Plaintiff from obtaining a firearm." The dealer ultimately sold the firearm to someone else.

In April 2021 at Regina's request the Department issued a letter to Regina pursuant to section 30105[4] declaring him eligible to possess and purchase firearms and ammunition.

2. *Regina's Lawsuit*

Regina filed this lawsuit in March 2021. In his operative second amended complaint Regina asserted a cause of action for violation of his civil rights (42 U.S.C. § 1983), alleging Penal Code section 28220, subdivision (f)(4), was unconstitutional on its face because advising a firearms dealer the government has been unable to verify eligibility has a pronounced chilling effect on an individual's Second Amendment rights. He also alleged the statute was unconstitutional as applied because it delegated to the dealer the right to prohibit him from purchasing a gun even though he was not ineligible, particularly when the Department knew at the time he was not disqualified from obtaining a firearm. Regina also sought a judicial declaration section 28220, subdivision (f)(4), violated the Second Amendment on its face and as applied and was preempted by the Brady Act.[5]

---

[4] Section 30105 permits an individual for a fee to directly request the Department perform a firearms eligibility check "for that individual."

[5] In addition to these two causes of action, Regina's second amended complaint asserted a third cause of action for injunctive relief and a fourth for attorney fees under title 42 United States Code section 1988(b). Regina does not dispute these purported causes of action are remedies for his civil rights cause of action, not separate legal claims.

### 3. *The State's Demurrer and the Trial Court's Ruling*

The State (including the current and former Attorneys General) demurred, arguing Regina's pleading failed to state facts sufficient to constitute a cause of action. The State argued section 28220, subdivision (f)(4), did not violate the Second Amendment on its face or as applied to Regina because the statute did not prohibit him from obtaining the firearm. To the contrary, it expressly authorized the dealer to complete the sale. The State also argued the statute was not in conflict with, and thus not preempted by, federal law.[6]

The trial court agreed with the State that section 28220, subdivision (f)(4), did not implicate Second Amendment rights and sustained the demurrer to the second amended complaint without leave to amend. The court entered judgment on September 30, 2021. Regina filed a timely notice of appeal.

---

[6] Together with its demurrer, the State requested the trial court take judicial notice of the records from the Los Angeles County Superior Court relating to Regina's conviction in 1968 for receipt of stolen property. Those records, which it attached to its request, included an information filed in 1967 charging Regina with grand theft and receipt of stolen property; a 1968 minute order stating Regina had been found guilty of receipt of stolen property and sentenced to probation; and an October 1969 order reducing Regina's conviction to a misdemeanor pursuant to section 17 and dismissing the case. In footnote 4 of its brief in support of its demurrer, the State cited these records to support its assertion it had complied with section 28220, subdivision (f)(4), because nothing in the court record conclusively established the final disposition of Regina's 1967 arrest for burglary.

# DISCUSSION

1. *Standard of Review*

A demurrer tests the legal sufficiency of the factual allegations in a complaint.  We independently review the trial court's ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense.  (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768; *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)  We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken.  (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 20; accord, *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967*; Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 848), but liberally construe the pleading with a view to substantial justice between the parties.  (Code Civ. Proc., § 452; *Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 726; see *Schifando v. City of Los Angeles, supra*, 31 Cal.4th at p. 1081.)

"'Where the complaint is defective, "[i]n the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his [or her] complaint."'"  (*Aubry v. Tri-City Hospital Dist., supra*, 2 Cal.4th at p. 970.)  A plaintiff may demonstrate for the first time to the reviewing court how a complaint can be amended to cure the defect.  (Code Civ. Proc.,

§ 472c, subd. (a) ["[w]hen any court makes an order sustaining a demurrer without leave to amend the question as to whether or not such court abused its discretion in making such an order is open on appeal even though no request to amend such pleading was made"]; see *Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1132 [plaintiff may carry burden of proving an amendment would cure a legal defect for the first time on appeal].)  "[L]eave to amend should not be granted where . . . amendment would be futile."  (*Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 685; see generally *Ivanoff v. Bank of America, supra,* 9 Cal.App.5th at p. 726.)

  2. *Section 28220*

  Section 28220 specifies the procedures for the background checks required before the Department authorizes a licensed firearms dealer to sell or transfer a firearm to a prospective purchaser.  When the dealer submits firearm purchaser information, the Department must examine its records, those from the State Department of State Hospitals and the National Instant Criminal Background Check System (NICS), to determine if the purchaser is prohibited by state or federal law from possessing, receiving, owning or purchasing a firearm. (§ 28220, subds. (a)(1), (b).)  If the initial check reveals the purchaser is ineligible, the Department must immediately notify the firearms dealer and law enforcement that the transaction is denied.  (§ 28220, subd. (c); Cal. Code Regs, tit. 11, § 4230, subd. (b).)  If the transaction is approved, the dealer may deliver

the firearm following a 10-day waiting period. (Cal. Code Regs., tit. 11, § 4230, subd. (a).)[7]

When the background check reveals the purchaser has been "arrested for, or charged with, a crime that would make the purchaser, if convicted, a person who is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, and the department is unable to ascertain whether the purchaser was convicted of that offense," the Department must immediately notify the dealer to delay the transfer of the firearm. (§ 28220, subd. (f)(1)(A)(ii).) The Department is also to notify the prospective purchaser and permit the individual to identify any inaccuracies on an approved Department form. (§ 28220, subd. (f)(1)(B)(2).) If within 30 days of the dealer's original submission of the purchaser information the Department determines that the "final disposition" of the arrest or criminal charge does not disqualify the individual from owning, purchasing or possessing a firearm, it "shall immediately notify the dealer of that fact, and the dealer may then immediately transfer the firearm to the purchaser . . . ." (§ 28220, subd. (f)(3)(A); see Cal. Code Regs., tit. 11, § 4230, subd. (b)(1)(B) ["'[a]pproval after Delay' status shall be designated when the Department approves an application to purchase a firearm after identifying a 'Delayed' status"].)

If the Department "is unable to ascertain the final disposition of the arrest or criminal charge . . . within 30 days of the dealer's original submission of purchaser information to the

---

[7] The 10-day waiting period allows a purchaser to reconsider an impulsive act of violence or self-harm that may be motivating the purchase. (*Silvester v. Harris* (9th Cir. 2016) 843 F.3d 816, 823.)

10

department pursuant to this section, the department shall immediately notify the dealer and the dealer may then immediately transfer the firearm to the purchaser . . . ." (§ 28220, subd. (f)(4); see Cal. Code Regs., tit. 11, § 4230, subd. (b)(1)(C) ["an '[u]ndetermined' status shall be designated when 30 days have passed since the original transaction date and the Department is unable to determine a purchaser's eligibility"; delivery of firearm in those circumstances shall be made "at the discretion of the Dealer"].)[8]

### 3. *The Court Properly Sustained the State's Demurrer to the Second Amended Complaint*

#### a. *Governing law*

To state a claim under title 42 United States Code section 1983[9] a plaintiff must allege the violation of a right secured by the United States Constitution or laws of the United

---

[8] Other parts of section 28220 require the same procedures when an initial background check reveals a person has been hospitalized for mental health treatment or evaluation (§ 28220, subd. (f)(1)(A)(i)) or the person is an individual described in subdivision (a) of section 27535 (purchasing more than one handgun or rifle within a 30-day period) (§ 28220, subd. (f)(1)(A)(iii)).

[9] Title 42 United States Code section 1983 provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress."

11

States by a person acting under color of state law. (*West v. Atkins* (1988) 487 U.S. 42, 48; *Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 384.) Both Regina's section 1983 claim and his cause of action for declaratory relief are premised on the allegation that section 28220, subdivision (f)(4), violates the Second Amendment on its face and as applied to him.[10]

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." As applied to the states through the Fourteenth Amendment, the Second Amendment, at minimum, protects the right of ordinary, law-abiding citizens to possess a handgun in the home for self-defense. (See *McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742, 778; *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*).)

---

[10] Although his prayer for relief requested an award of damages, Regina now concedes he has no right to damages in an action against the State or its Attorneys General in their official capacities under title 42 United States Code section 1983 (see *Howlett v. Rose* (1990) 496 U.S. 356, 366 [states and state officers sued in their official capacities are not considered persons under section 1983 and are immune from liability under the statute by virtue of the Eleventh Amendment and the doctrine of sovereign immunity]). However, Regina is entitled to seek injunctive relief against state officers acting in their official capacities. (See *Will v. Michigan Department of State Police* (1989) 491 U.S. 58, 71, fn. 10 ["a state official in his or her official capacity, when sued for injunctive relief, would be a person under [section] 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State'"]; accord, *California DUI Lawyers Assn. v. Department of Motor Vehicles* (2022) 77 Cal.App.5th 517, 534.)

In *Bruen*, *supra*, 142 S.Ct. 2111, decided while Regina's appeal was pending, the United States Supreme Court held the Second Amendment's guarantee is considerably broader, extending to law-abiding citizens seeking to carry a gun outside the home for purposes of self-defense. The *Bruen* Court then found a New York law requiring a citizen show "proper cause" or a "special need" for protection to obtain a public-carry permit infringed that Second Amendment right. (*Bruen*, at pp. 2122, 2156.)[11]

The *Bruen* Court began its analysis by describing the two-step framework that lower appellate courts since *Heller, supra,* 554 U.S. 570 had employed to determine whether a law or regulation infringed the Second Amendment: First, the court considered whether the regulated conduct fell beyond the text of the Second Amendment as informed by history and tradition. If so, the regulated activity was categorically unprotected. "But, if the historical evidence at this step is 'inconclusive or suggests that the regulated activity is *not* categorically unprotected,'" the appellate courts moved to a second step: a means-end scrutiny. (*Bruen*, *supra*, 142 S.Ct. at p. 2126.) A significant burden on the core Second Amendment right required a very strong public-interest justification and a close means-end fit. (*Ibid*.)

Writing for the *Bruen* majority, Justice Thomas characterized the lower appellate courts' "two-step approach" as "one step too many." (*Bruen*, *supra*, 142 S.Ct. at p. 2127.) "*Heller* and *McDonald* do not support applying means-end scrutiny in the

---

[11] New York's Sullivan Law permitted public carry only if an applicant could prove "good moral character" and "proper cause." (*Bruen, supra*, 142 S.Ct. at p. 2122.)

Second Amendment context." (*Ibid*.) "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" (*Id*. at pp. 2129-2130.)

Turning to the New York permit law requiring citizens to prove a special need for self-defense to obtain a public carry permit,[12] the *Bruen* Court observed, and the parties did not dispute, the law plainly fell within the original scope of the Second Amendment right to bear arms. (*Bruen, supra,* 142 S.Ct. at p. 2135.) The question before the Court was whether the State could demonstrate its law restricting that right was "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." (*Id*. at p. 2127.) Finding the State of New York's assertion its regulation was rooted in history and tradition at the time the Second Amendment and Fourteenth Amendment[13] were adopted unsupported by the historical record,

---

[12] The *Bruen* plaintiffs were denied public carry licenses. As in the case at bar, the *Bruen* plaintiffs asserted a cause of action under title 42 United States Code section 1983 and claims for declaratory relief, arguing the New York statute was unconstitutional on its face and as applied.

[13] The *Bruen* Court described "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" and

the *Bruen* Court found the State did not carry its burden and held New York's public-carry restriction unconstitutional on its face.  (*Id.* at p. 2152.)

> b. *Regina's facial constitutional challenge fails as a matter of law*

To prevail on a claim a statute is unconstitutional on its face, the petitioner must demonstrate that "'no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all its applications." (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 449; see also *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual].)

In addressing the parties' arguments, we emphasize the limited nature of Regina's constitutional challenge:  Regina does not contest the constitutionality of the statutory scheme's background-check requirements, the 10-day waiting period or the 30-day limit on the time the government can investigate a final disposition after an initial background check reveals a criminal arrest, charge or other potentially disqualifying event; nor does he argue a finding of disqualification under section 28220, subdivision (f)(3)(B), for a disqualifying conviction or mental

---

stated it need not resolve the question, explaining "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."  (*Bruen*, *supra*, 142 S.Ct. at p. 2138.)

health evaluation would violate the Second Amendment.[14]  He
also acknowledges that section 28220, subdivision (f)(4), like
section 28220, subdivision (f)(3)(A), which he claims the
Department should have utilized, vests the dealer with discretion
to immediately release the firearm to the purchaser.

Regina's Second Amendment challenge is restricted to the
provision in section 28220, subdivision (f)(4), that directs the
Department to advise the dealer when it has been unable to
ascertain within the statutory period whether the purchaser is
ineligible to possess a firearm.  While acknowledging the
authorization to the dealer to release the firearm only in its
discretion is nearly identical in both subdivision (f)(3)(A), which
he concedes is constitutional, and (f)(4), which he argues is not,
Regina contends the difference between those two subdivisions is
manifest:  According to Regina, the firearms dealer is far more
likely to exercise its discretion in favor of completing the sale
when notified by the Department a person has not been found to
be legally prohibited from obtaining a firearm than when
informed the Department has been unable to verify whether or
not a purchaser is eligible to possess a firearm.  Thus, Regina

---

[14]  Regina's tacit acceptance of those aspects of the statutory
scheme is understandable.  Both *Bruen* and *Heller* emphasized
the Second Amendment right to bear arms belongs to "'law-
abiding, responsible citizens.'" (*Bruen, supra,* 142 S.Ct. at
p. 2131 ["[t]he Second Amendment 'is the very *product* of an
interest balancing by the people' and it 'surely elevates above all
other interests the right of law-abiding, responsible citizens to
use arms' for self-defense"]; *Heller, supra,* 554 U.S at p. 626
["nothing in our opinion should be taken to cast doubt on
longstanding prohibitions on the possession of firearms by felons
and the mentally ill"].)

argues, while section 28220, subdivision (f)(4), does not prohibit the transfer of the firearm to the purchaser, the disclosure to the dealer that the Department has not been able to ascertain the purchaser's eligibility has an undeniable, if indirect, "chilling effect" on a purchaser's ability to exercise his or her Second Amendment rights.

We have serious doubt whether the "chilling effect" doctrine, a central tenet of First Amendment jurisprudence (see, e.g., *Americans for Prosperity Foundation v. Bonta* (2021) __ U.S. ___, ___ [141 S.Ct. 2373, 2389] ["When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals.  The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive'"]; *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 871-872 [a vague statute chills rights protected by the First Amendment by creating potential for self-censorship]), applies in the Second Amendment context.  (See *United States v. Chester* (4th Cir. 2010) 628 F.3d 673, 688 [importing this "'extraordinary' exception . . . into the Second Amendment context would be inappropriate" because the overbreadth, or "chilling effect," doctrine "is the Court's solution to [a] speech-specific problem"]; *Grendell v. Ohio Supreme Court* (6th Cir. 2001) 252 F.3d 828, 834 ["[i]t is well-settled that facial constitutional challenges relying on the overbreadth doctrine, and the resultant chilling effect such overbreadth has on speech, are limited to the First Amendment sphere"]; see also *Ollie v. University of Connecticut* (D.Conn. 2019) 364 F.Supp.3d 143 151 ["courts have repeatedly declined to apply the chilling doctrine outside of the limited context of free speech and free expression

claims under the First Amendment"].)  Nevertheless, we need not resolve that question because, even if the doctrine applied, the statute generates no chill on the exercise of a prospective purchaser's rights.  The dealer remains free after receiving the subdivision (f)(4) notice to sell or not sell the firearm to the individual in the same manner as if the Department had determined the individual was not disqualified, no more and no less.  The Second Amendment does not guarantee that a firearms dealer vested with discretion to sell its products will elect to exercise that discretion in only one way.

Notwithstanding the express statutory language, Regina contends section 28220, subdivision (f)(4)'s authorization to complete the sale is illusory because, as this case illustrated, few dealers will want to assume the "risk of unknowable potential civil and criminal liability" by transferring the firearm to a person whose eligibility (or ineligibility) cannot be determined. According to Regina, when the final disposition of a potentially disqualifying charge or arrest or mental health evaluation cannot be ascertained, the government must simply notify the dealer that it has not found the person ineligible, in accordance with section 28220, subdivision (f)(3)(A).  By informing the dealer that eligibility could not be determined within the statutory period, he insists, the Department has effected a "prior restraint," all but ensuring the dealer will not complete the transaction.

Regina's prior restraint analysis is deeply flawed.  In contrast to statutory provisions that prohibit a dealer from transferring a firearm to an individual barred from owing or possessing a firearm (e.g., § 28220, subd. (f)(3)(B)), the dealer's discretion under section 28220, subdivision (f)(4), to sell or transfer the firearm is real and complete.  No potential liability is

18

created, or penalty imposed by the State, if a firearms dealer transfers a gun pursuant to subdivision (f)(4), rather than under subdivision (f)(3)(A). A dealer in both circumstances is subject to the same risks as any other seller of a potentially dangerous product.

Although *Bruen*, *supra*, 142 S.Ct. 2111 marks a significant change in Second Amendment jurisprudence, Regina's insistence a remand is necessary for the parties to brief, and the trial court to consider in the first instance, the State's demurrer in light of that decision, is misplaced. Under *Bruen* it would be the State's burden to justify section 28220, subdivision (f)(4), as a regulation of gun ownership deeply rooted in history and tradition at the time the Second Amendment was adopted only if the conduct regulated by that provision fell within the original scope of the Second Amendment—"'the individual right [of law-abiding citizens] to possess and carry weapons in case of confrontation' that does not depend on service in the militia." (*Bruen*, at p. 2127.) For the reasons discussed, a letter authorizing the sale of a firearm using the language of section 28220, subdivision (f)(4), does not implicate the right to bear arms and does not fall within the original scope of the Second Amendment right as interpreted in *Bruen*.[15] A remand is neither necessary nor appropriate.

---

[15] In sustaining the State's demurrer the trial court ruled section 28220, subdivision (f)(4), did not restrict any rights within the original scope of the Second Amendment. It did not reach (nor did it need to) the second step of the two-step means-end scrutiny the *Bruen* Court rejected.

c. *Regina's as-applied challenge also fails*

Regina's as-applied challenge fails for a similar reason. He argues, as a result of the Department's subdivision (f)(4) letter informing the dealer it was unable to determine whether Regina was ineligible to purchase the firearm, the dealer refused to complete the sale. However, as discussed, there was no state interference with his Second Amendment rights, even accepting on demurrer the truth of Regina's allegations. Far from constituting an unconstitutional delegation to the dealer of the decision whether to transfer the firearm, as Regina contends, the notice under section 28220, subdivision (f)(4), authorized the dealer to release the firearm even though a background check revealed a potentially disqualifying event and the Department was unable to confirm Regina's eligibility within the 30-day statutory period. Authorizing a transfer under these circumstances, rather than prohibiting it or imposing a further delay while the investigation proceeded, recognized and enforced Regina's Second Amendment rights; it did not restrict any of those rights as interpreted in *Bruen* and *Heller*.

Regina argues in the alternative the Department violated his Second Amendment rights when it told the dealer it could not ascertain his eligibility to own a firearm even though it had information conclusively establishing he was not ineligible. He argues that misapplication of section 28220, subdivision (f)(4), implicates the Second Amendment because the statute contains no mechanism for him to challenge the Department's statement his eligibility could not be determined. Whatever the Department's error, if any, it is not of constitutional dimension.

20

And the issue of Regina's remedy for a statutory violation is not before us in this appeal.[16]

4. *The Trial Court Properly Ruled as a Matter of Law Section 28220, Subdivision (f)(4), Was Not Preempted by the Brady Act*

a. *Preemption principles*

"'The Supremacy Clause provides that "the Laws of the United States" (as well as treaties and the Constitution itself) "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." [U.S. Const.] Art. VI, cl. 2. Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation. It may do so through express language in a

_____

[16] The State explains, when inaccurate information is used in connection with a background check, an individual may petition the Department to correct or consider additional records (Pen. Code, § 11126), obtain a personal firearms eligibility check under Penal Code section 30105 (which Regina has since done), or petition for a writ of mandate under Government Code section 1085. In addition, the Brady Act expressly authorizes any one unlawfully denied a firearm under its provisions to "bring an action against the State or political subdivision" responsible for providing erroneous information or denying the transfer. (18 U.S.C. § 925a.)

Regina, however, alleged the Department intentionally or negligently disregarded accurate information in its possession, not that it based its decision on inaccurate information. Whether Government Code section 1085 or any other procedural vehicle was available to challenge the statutory violation Regina alleged is immaterial to the constitutional challenge underlying his title 42 United States Code section 1983 cause of action and request for declaratory relief.

21

statute.  But even where . . . a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law, rule, or other state action.'"  (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 628 (*County of Butte*); accord, *Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. 373, 376-377.)

"There are 'three different types of preemption—"conflict," "express," and "field," [citation]—but all of them work in the same way:  Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted.'" (*County of Butte, supra,* 13 Cal.5th at p. 628.)  Acknowledging that Congress specifically declared in the Brady Act its intent not to occupy the field[17] and the absence of any express preemption of section 28220, subdivision (f)(4), by the Brady Act, Regina focuses on conflict preemption.

"Conflict preemption 'exists where "compliance with both state and federal law is impossible," or where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."'" [Citation.]  '[T]he threshold for establishing' such an obstacle 'is demanding:  "It requires proof Congress had particular purposes and objectives in mind[ and] a demonstration that leaving state law in place would

---

[17]     Congress declared, "No provision of this chapter shall be construed as indicating an intent on the part of Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together."  (18 U.S.C. § 927.)

compromise those objectives . . . .'" [Citations.] "'[P]reemption analysis is not '[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'" [citation] but a focused inquiry into 'whether there exists an irreconcilable conflict between the federal and state regulatory schemes.' [Citation.] 'The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute.'" (*County of Butte, supra,* 13 Cal.5th at pp. 628-629; accord, *Chamber of Commerce of the United States of America v. Whiting* (2011) 563 U.S. 582, 607 (plur. opn. of Roberts, C. J.) [a "'high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act'"].)

  b. *The Brady Act*

Congress enacted the Brady Act in 1993, as an amendment to the Gun Control Act of 1968. (Pub.L. No. 103-159 (Nov. 30, 1993) 107 Stat. 1536.) The Brady Act, which established the NICS, prohibits a federally licensed firearms dealer from transferring a firearm to anyone not licensed under the Brady Act unless the licensee contacts the NICS and the NICS either provides the licensee with a unique identification number for the purchase or the licensee has not been notified within three business days of contacting NICS that the receipt of the firearm by the prospective transferee would violate provisions of the Brady Act[18] or federal, state, local or tribal law. (18 U.S.C. § 922(t)(2)(A), (t)(2)(B)(i)-(ii).)

---

[18] Title 18 United States Code section 922(g)(1) identifies a variety of enumerated circumstances under which it is unlawful to possess a firearm, including when a person has been convicted of any felony.

23

The Brady Act's implementing regulations specify the manner in which the FBI NICS Operations Center is to provide the results of the background check to the federally authorized firearms dealer: The Operations Center must issue a "'Proceed' response" when the NICS background check discovers no disqualifying information. (28 C.F.R. § 25.6 (c)(1)(iv)(A).) It is to issue a "'Delayed' response" if the background check "finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law. A 'Delayed' response . . . indicates that the firearm transfer should not proceed pending receipt of a follow-up 'Proceed' response from the NICS or the expiration of three business days (exclusive of the day on which the query is made), whichever occurs first." (28 C.F.R § 25.6 (c)(1)(iv)(B).) Finally, a "'Denied' response" must issue if the background check reveals that transfer of the firearm would violate the Brady Act or state law. (28 C.F.R. § 25.6 (c)(1)(iv)(C).)

The implementing regulations define "Proceed" as a "NICS response indicating that the information available to the system at the time of the response did not demonstrate that transfer of the firearm would violate federal or state law. A 'Proceed' response would not relieve [a federally licensed firearms dealer] from compliance with other provisions of Federal or state law that may be applicable to firearms transfers. For example, under 18 U.S.C. 922(d), [a federally licensed firearms dealer] may not lawfully transfer a firearm if he or she knows or has reasonable cause to believe that the prospective recipient is prohibited by law from receiving or possessing a firearm." (28 C.F.R. § 25.2.)

24

c. *No conflict preemption exists as a matter of law*

Regina contends that section 28220, subdivision (f)(4), is irreconcilable with, and thus preempted by, the Brady Act. According to Regina, federal regulations require that a federally licensed firearms dealer receive from the government after a background check either a "proceed" response, thereby giving the dealer some measure of comfort in completing the transaction, or a "denied" response, removing the dealer's discretion to complete the transfer entirely. In this way, he submits, the Brady Act closely resembles section 28220, subdivision (f)(3)(A), authorizing release of the firearm, and subdivision (f)(3)(B), prohibiting it. Section 28220, subdivision (f)(4), Regina argues, creates an irreconcilable third option: an inconclusive "we-can't-tell response" that provides no measure of comfort to the dealer who will, as Regina claims this case demonstrates, predictably decline to complete the transfer. Accordingly, he argues, section 28220, subdivision (f)(4), imposes on the dealer all the risk the Brady Act was designed to remove.

Regina presents no authority for the assertion the purpose of the Brady Act was to remove from licensed firearms dealers any risk in transferring firearms as opposed to reducing gun violence, as its full name—the Brady Handgun Violence Prevention Act—denotes. Nor do the provisions of the Brady Act or its implementing regulations contain any such suggestion. In any event, Regina fundamentally mischaracterizes the Brady Act and its governing regulations. Contrary to Regina's contention, the Brady Act does not require a licensed dealer to await an explicit "proceed" response to complete the transfer. When a dealer receives a "delayed" response after something is found during a background check, the dealer must wait three business

days and then, if no further communication is forthcoming, it may, if it wishes, complete the sale without receiving a proceed response.  (28 C.F.R § 25.6 (c)(1)(iv)(B).)  While the Brady Act, like California's statutory scheme and implementing regulations, prohibits the transfer when the person seeking the firearm is disqualified from possessing a firearm, nothing in the Brady Act mandates the dealer to complete a sale upon a proceed response or after three days upon receiving a delayed response.  Apart from different time provisions (three business days from completion of the NICS check under federal law and 30 days from the initial submission of purchaser information under section 28220, subdivision (f)(4)), which Regina does not challenge, section 28220, subdivision (f)(4), effectively tells the dealer the same thing as 28 Code of Federal Regulations part 25.6(c)(1)(iv)(B) when an initial background check reveals something that causes a delay and no explicit authorization to proceed is forthcoming within the statutory time limit: Potentially disqualifying information was discovered but could not be verified or refuted within the statutory time limit; accordingly, you may proceed with the transfer.  There is no irreconcilable conflict and no preemption.

5.  *Conclusion*

Regina's causes of action are premised on the contention that section 28220, subdivision (f)(4), violates the Second Amendment or is preempted by federal law.  Both arguments are wrong as a matter of law.  Because Regina has not demonstrated how his complaint could be amended to state viable claims, the

trial court did not err in sustaining the State's demurrer to the second amended complaint without leave to amend.[19]

## DISPOSITION

The judgment is affirmed. The State is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.

---

[19] "Strictly speaking, a general demurrer is not an appropriate means of testing the merits of the controversy in a declaratory relief action because plaintiff is entitled to a declaration of his rights even if it be adverse. However, where the issue is purely one of law, if the reviewing court agreed with the trial court's resolution of the issue it would be an idle act to reverse the judgment of dismissal for a trial on the merits. In such cases the merits of the legal controversy may be considered on an appeal from a judgment of dismissal following an order sustaining a demurrer without leave to amend and the opinion of the reviewing court will constitute the declaration of the legal rights and duties of the parties concerning the matter in controversy." (*Levi v. O'Connell* (2006) 144 Cal.App.4th 700, 706 [cleaned up]; accord, *Nede Mgmt. Inc. v. Aspen American Ins. Co.* (2021) 68 Cal.App.5th 1121, 1131.)